[Crim. No. 3642. In Bank.—November 1, 1933.]

THE PEOPLE, Respondent, v. CLAUDE FORBES, Petitioner.

H. Boyarsky, M. F. Ryan and Emile Grossman for Petitioner.

U. S. Webb, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

SEAWELL, J.—This is an appeal by petitioner from an order of the Superior Court of the State of California, County of Alameda, denying the issuance of the ancient writ of error *coram nobis* taken after judgment rendered, imposing upon him the death penalty upon a plea of guilty of murder of the first degree entered upon arraignment to an indictment charging him with murder committed in the manner hereafter set forth. Section 189 of the Penal Code provides that "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing . . . is murder of the first degree." Section 190 of the Penal Code pro-

vides that every person guilty of murder of the first degree shall suffer death or confinement in the state prison for life, at the discretion of the jury trying the same, and upon a plea of guilty the court shall determine whether he shall suffer death or confinement in the state prison for life. In order to determine which penalty shall be imposed the court must, upon a plea of guilty of murder of the first degree, hear evidence describing the commission of the crime, as to whether the killing was committed by lying in wait, or was wilful, deliberate and premeditated, or attended with unusual cruelty, in order to determine which of the two penalties prescribed by law, death or life imprisonment, should be imposed as the penalty for the commission of each particular murder.

The office of the ancient writ of *coram nobis* was extensively discussed by this court in *People* v. *Reid,* 195 Cal. 249 [232 Pac. 457, 36 A. L. R. 1435], and it was there said that its application will rarely be warranted in view of our ample and liberal system of appeals and remedial writs, and, further, in view of the plenary power of pardon, reprieve and commutation conferred upon the chief executive of the state by the Constitution, to be freely exercised except in cases of habitual criminals, in the annulment of any judgment which may have been unjustly or improperly obtained in any court of the state. Without entering into a discussion as to the applicability of the writ to the situation presented, we will consider the case as one in which the writ was properly issued as a matter of right. The right to the writ as presented involves solely issues of fact which have been passed upon by the Superior Court of Alameda County, and falls within the universal rule which requires reviewing courts to affirm judgments of trial courts unless the evidence upon which the judgment is rendered is so unsubstantial or improbable as to amount to no evidence. Notwithstanding said rule, we are of the mind, in view of the perfidious nature of the charges which have been made by petitioner and his counsel against the trial court which pronounced the judgment, that it is due the trial judge, the officers of the law and other witnesses who participated in the proceeding, that all of the facts upon which the charges are based should be fully set forth. In so doing, not only the positive contradictory averments of the several affiants and

the credibility of each one become matters for sober consideration, but also the motives or lack of motives, and the interest which any of said affiants may have had in the result of the proceedings become important questions to be weighed ·with such other matters as may tend to influence the persons whose credibility is the object of scrutiny. The unusually cruel manner in which the crime to be hereinafter adverted to was committed, and the carnal and mercenary motives which prompted it, after long planning and deliberation, also have a place in determining whether or not the petitioner, as between two desperate alternatives, would be likely to chance his fate with a judge of the court, who, he hoped, might be temporarily disposed to relieve him of the extreme penalty of the law, rather than face a jury which would write its verdict after listening to an exceptionally wicked and harrowing crime to which there has not been offered one single mitigating circumstance.

Claude Forbes and Bess Nelson were jointly charged by an indictment returned against them on June 21, 1932, with having murdered Harry A. Nelson, on June 14, 1932. Harry A. Nelson and Bess Nelson were husband and wife and they resided together with their daughter, aged seven years, at the family residence No. 5314 Boyd Avenue, Oakland, until about midnight, May 30, 1932, at which time she left the family domicile in company with Claude Forbes and did not return until a day or two after the homicide. Harry A. Nelson, the deceased, was deputy county assessor of Alameda County and served in the World War. He carried, it would seem, a war risk insurance policy in the sum of $10,000, and he and his wife owned the home, on which there appeared to be some encumbrance. They also had a joint deposit account in an Oakland bank of an undisclosed sum, but not less than $190 or $200. Each separately owned an automobile. The mother of Mrs. Nelson and the wife of Forbes resided at said family residence with the Nelsons. The mother did the cooking and household duties and Mrs. Forbes took care of the child and assisted in the housework. Mrs. Nelson's mother and Mrs. Forbes and the child occupied rooms at the rear of the house while the Nelsons occupied the front bedroom. Mrs. Nelson was away from her home much of the time during the day. She busied herself very largely in matters of fraternal types

contrary to the wish of her husband. The Nelsons, with a few friends, devoted their home evenings frequently to playing bridge, which pastime seems to have furnished mutual grounds for accusations of improprieties, one against the other. There appears to have been a lack of conjugal confidence on the part of both spouses. Mrs. Forbes entered the Nelson household some two or three months before the homicide was committed to take care of the seven year old daughter. Her husband, Claude Forbes, petitioner herein, was not a frequent visitor at the Nelson home during the first period of his wife's employment, but as time went on his visits became more frequent. Finally he drove Mrs. Nelson quite frequently on her fraternity missions and he latterly became an occasional bridge guest. It must have become plain from the conduct of Forbes and Mrs. Nelson that improper relations existed between them, a fact which is admitted by both. Their illicit relations were openly revealed at about midnight, May 30, 1932, when after the bridge game had ended and the guests had left, except Forbes, a quarrel ensued between Nelson and his wife, and the husband told her that he wanted her to get out of the house and stay out; that he never wanted to see her again. He handed Forbes his hat, according to the story told by Forbes, and told him to go with Mrs. Nelson. It is a fact admitted by Forbes that he and Mrs. Nelson had engaged in sexual intercourse before this occurrence. Forbes and Mrs. Nelson left the Nelson home together and went to an Oakland hotel, where they registered as husband and wife under a fictitious name, occupying the same bed. On the following morning Mrs. Nelson went with Forbes to a clothing store and purchased on her account a suit of clothes for Forbes and other articles and then went to the bank in which she and her husband had a joint deposit and drew therefrom $190 and gave the money to Forbes. According to their agreement he purchased rail transportation to Minneapolis, Minnesota. From there they visited Mrs. Nelson's grandmother residing in that state. Failing in his plan to obtain employment Forbes and Mrs. Nelson left Minnesota on June 8th for California. They passed through San Francisco on June 11th and proceeded to Santa Cruz. There they registered at a hotel as husband and wife. While on their trip to Minnesota they had discussed ways and means of getting Harry A. Nelson

out of the way. When they arrived at Santa Cruz Mrs. Nelson's funds were low and they discussed plans to "bump Harry off". That they conspired to commit the murder is admitted by both. On Monday, June 13th, Forbes went to a plumbing shop at Santa Cruz and bought a corrugated iron pipe twelve inches in length and approximately one and a fourth inches in diameter. He told the plumber that he was going to use it as a camp stake. He also purchased black friction tape which he used to cover the iron pipe. The wrapping was done in his room and doubtless was for the purpose of affording a firmer and better gripping surface. On the afternoon he took the autostage for Oakland. He knew the hour Nelson was accustomed to return from his evening ride. His original intention, as told by him, was to lie in wait in the garage and waylay Nelson as he alighted from the car. Upon arriving in Oakland he bided his time by attending an out-of-the-way picture show. Shortly before the hour that Nelson was in the habit of returning home he hired a taxi and was driven to a street corner within two or three blocks of the Nelson home. It was his purpose to await Nelson's return to the garage and slay him there, but Nelson had unexpectedly returned as a light in his bedroom indicated. He then walked the streets of Oakland for several hours awaiting what he believed to be an opportune time to carry out his design. He returned to the Nelson home at about 3:30 o'clock in the morning and found the house darkened. He entered the child's playhouse and obtained a six-foot ladder, which he placed beneath a rear window, and obtained a piece of metal from the garage, which he used to jimmy the window through which he entered, after having removed his shoes. The Nelson child, petitioner's wife, Mrs. Nelson's mother and the deceased were not awakened by his entrance. He wore gloves to avoid telltale finger-prints. Forbes then went to Nelson's room, turned on the light and began to bludgeon Nelson, who was sleeping, into insensibility. The physician who conducted the autopsy testified that the skull of Nelson showed at least six or seven distinct fractures, some of which overlapped. Pieces of the skull punctured the brain tissue. Forbes, in his confession, said that with the first blow Nelson emitted a feeble, inarticulate sound, but uttered no sound thereafter. When Nelson was

discovered the next morning by the household his head was near the foot of the bed and the bed was drenched in pools of blood. Nelson never gained consciousness and died on the third day thereafter. He was a small man in stature, weighing 145 or 150 pounds, and was about five feet ten inches in height. Forbes left the house by the front door, threw the jimmy away at a point not far distant from the house and disposed of the taped iron pipe in a vacant lot. It was afterwards found by some children playing in the lot. He went to a restaurant in Oakland after he committed the crime, where he ate his breakfast and read a newspaper until the autostage which operated between Oakland and San Jose set out on the morning trip. At the latter city he took a Santa Cruz autostage and arrived at the depot in Santa Cruz at 10:30 A. M. Mrs. Nelson was awaiting his return at the depot. She knew that his mission to Oakland was to do away with her husband. Both admit the purpose of the journey. Before he left for Oakland she warned Forbes to be careful as Nelson might have a gun on his person. Forbes seemed not disposed to go into full details of the horrible crime, but laconically replied to her questioning, "I gave Harry the works." He told her to watch the newspapers for results. He was quite certain that he had killed him, but he evinced anxiety as to the result. He and Mrs. Nelson expected to marry and become the owners of the Nelson home. Forbes said that he intended to divorce Mrs. Forbes. He had give some attention to the time required to establish a residence at Reno, Nevada, for divorce purposes. He gave no care to the future of his wife as he said there was an understanding between them that when one tired of the other he or she was at liberty to obtain a divorce. Forbes and Bess Nelson were arrested on the afternoon of the day the crime was committed and subsequently charged with the murder. At first Forbes made an attempt to establish an alibi which he and Mrs. Nelson had prearranged, wherein it was to be claimed that he was at Pebble Beach on the night of the murder, but for one reason or other the alibi defense broke down. Cumulative evidence was so conclusive as to their participation in the crime that both finally confessed to its commission. Independent of the several confessions which were voluntarily given by both defendants other evidence established their

guilt beyond a reasonable doubt. Many facts and circumstances corroborated their confessions.

Counsel who undertook the defense of Forbes and Bess Nelson were confronted with a case such as above outlined. There is no doubt that the several confessions of the defendants were legally admissible against them. The inculpatory facts and circumstances seemed irrefutable. Upon joint arraignment Forbes entered the double plea of not guilty and not guilty by reason of insanity. Mrs. Bess Nelson entered the single plea of not guilty by reason of insanity. Thereupon she moved for a severance of trial, which was denied, and a writ of mandate was issued by this court, but pending its consideration Forbes withdrew his pleas of not guilty and entered a single plea of guilty as charged. This action, of course, rendered the question of the right of severance moot and the writ was dismissed by stipulation of the attorney for Bess Nelson and the district attorney.

Bess Nelson went to trial and the jury found her sane. The same evidence received in the plea of insanity was, by stipulation of counsel, introduced in the proceeding to determine the penalty which should be imposed upon her as provided by section 190 of the Penal Code, and the court, on January 18, 1933, adjudged her guilty of murder in the first degree and sentenced her to the state prison for the term of her natural life. Prior to Bess Nelson's trial, on December 12, 1932, and at a time when she and her counsel were in court, Forbes appeared in court with his counsel and requested the trial judge, Honorable Fred V. Wood, that he be permitted to withdraw his said pleas of not guilty and not guilty by reason of insanity, and be given leave to enter a plea of guilty of murder of the first degree. The following proceedings where then had:

"The Court (addressing Forbes): You know what you are doing?

"Defendant Forbes: Certainly.

"The Court: Do you realize if you do that it may be the duty of the Court, if the crime is fixed at murder of the first degree, to sentence you to death?

"Defendant Forbes: Yes.

"The Court: Has anyone intimated to you or given you any encouragement as to what the Court would do in a case of this kind? (No answer.)

"The Court: Has anyone told you what the Court would do in the way of punishment?

"Defendant Forbes: No.

"The Court: You still want to withdraw your plea of 'not guilty' and your plea of 'not guilty by reason of insanity'?

"Defendant Forbes: Yes.

"The Court: Your counsel stated in chambers you wanted to change your plea and have the case continued for sentence until it is determined whether your co-defendant is sane or insane. Is that what you want to do?

"Defendant Forbes: Yes, your Honor.

"The Court: That is the understanding, is it?

"Defendant Forbes: Yes.

"The Court: That is your understanding from your conversations with Mr. Grossman?

"The Defendant: Anything that suits the convenience of your Honor.

"The Court: I thought from his talk in chambers that you would ask that sentence be postponed until after it is determined whether or not Mrs. Nelson is insane?

"Mr. Grossman (Forbes' attorney): That is satisfactory unless your Honor wants to continue it to some other time.

"The Court: My own idea is that is the proper thing to do. You want to do that; have your sentence postponed until that matter is determined?

"Mr. Grossman: Yes, your Honor."

The defendant was thereupon arraigned and he withdrew his former pleas and entered a plea of guilty. At the request of the defendant the time for pronouncing sentence was postponed to a time following the trial of Mrs. Nelson on the issue of insanity.

Upon the termination of the Forbes plea, Judge Wood remarked: "This changes the whole situation here." He then inquired of Mr. Heafey, attorney for Mrs. Nelson, if he would be ready to go to trial within two or three days. Mr. Heafey thought he should have more time than two or three days to prepare for trial and the matter went over to the afternoon session, whereupon the trial day was set by consent of all on January 3, 1933. In the colloquy following the plea of guilty entered by Forbes, Judge Wood remarked that the action of Forbes "changes the whole

situation''. Deputy District Attorney Olney remarked: ''We had no idea of the change of plea at all.'' At the request of Mr. Grossman, one of Forbes attorneys, joined in by the defendant himself, the time for pronouncing judgment was definitely fixed for January 9, 1933. As the judge was about to fix a day for pronouncing sentence the following proceeding occurred:

''The Court: Very well, the case is continued. The case of *People* v. *Bess Nelson* in the insanity matter is set down for January 3, 1933, at 10 o'clock a. m., by consent, and the case of *People* v. *Claude Forbes* at the defendant's request is set down for Monday, January 9, 1933, at 9:30 a. m., which is fixed as the time for pronouncing judgment. Of course, if you want to withdraw that plea you may do so.

''Mr. Grossman: Which plea do you refer to?

''The Court: I am referring to the defendant Forbes plea of guilty. I am just saying if he desires to withdraw his plea he may do so.

''Defendant Forbes: I am satisfied. I do not desire to change the plea, sir.''

The trial of Bess Nelson was concluded on January 14, 1933. On January 17, 1933, the time for pronouncing judgment upon Forbes having been regularly continued to that day, the trial judge, upon a hearing to determine the penalty which the crime merited, found the crime to be murder of the first degree and adjudged that petitioner should suffer death. The petitioner offered no evidence at the hearing in mitigation of the commission of the wilful, deliberate, premeditated and cruel killing, which was related at great length and with much detail at said hearing.

This brings us to a consideration of the merits and substance of the petition for the writ. Petitioner, through his attorneys Emile Grossman and H. Boyarsky, alleges that he was ''the victim of fraud, inadvertence, misapprehension, duress, mistake and excusable neglect, which ordinary prudence could not have guarded against'', whereby he was influenced to withdraw said pleas and enter a plea of guilty and that he was deprived of a trial on the merits. It is averred by petitioner that on or about December 9, 1932, one of his counsel, Emile Grossman, visited him at the county jail and informed him that he had entered into an agreement with Judge Fred V. Wood, whereby petitioner was ''to be

permitted by said Judge Wood to withdraw his plea of not guilty and not guilty by reason of insanity and to enter in lieu thereof a plea of guilty, and whereby your petitioner was to consent that the passing of sentence upon your petitioner be continued until after the trial of Bess Nelson, co-defendant herein, and whereby your petitioner was to receive a sentence of life imprisonment; that said Emile Grossman advised your petitioner to withdraw his said pleas of not guilty . . . and enter a plea of guilty; that your petitioner, relying upon the said statements of Emile Grossman, agreed with said Grossman to withdraw his said plea of not guilty . . . and enter a plea of guilty; that the said Emile Grossman thereupon informed your petitioner that the said Honorable Fred V. Wood desired that said agreement should be kept secret, and that your petitioner at no time should say anything or conduct himself in any manner as to indicate to the public and press that such agreement existed and that all proceedings herein were to be conducted in such manner as to conceal said agreement and so as to give the impression to the public and press that no such agreement existed; that on the 12th day of December, 1932, in pursuance of said agreement and understanding, your petitioner appeared before the said Honorable Fred V. Wood, and through his attorneys, Emile Grossman and H. Boyarsky, moved the said court to be permitted to withdraw his pleas heretofore entered of not guilty.'' The petition alleges a number of continuances which petitioner requested but which have no evidentiary weight. His averment that he had no previous notice of the day fixed for pronouncing judgment upon him is contrary to the fact. The provisions of section 190 of the Penal Code were notice to him that the court was required to hear testimony in order to determine the degree of punishment to be imposed. He could not have been surprised or misled by the court complying with the procedural requirement which occurs in all cases of pleas of guilty. He cannot now complain that he sat mute with his attorneys at his side while evidence of his wicked crime was given by the several witnesses. That he offered no evidence, if any there was, which was not included in the ample statements and confessions made by himself and Mrs. Nelson, was a matter wholly within the control of his attorneys, who might have examined each witness at length and, no doubt, could have obtained

a continuance upon the asking, for the production of evidence tending to mitigate the offense, if such existed. Nor has he any complaint that the stenographer, who reported in shorthand and transcribed into print the confession of petitioner and the testimony taken before the grand jury, was not present at the hearing. He made no objection to the introduction of said transcription of testimony. In fact, he stipulated that said testimony might be used at the hearing as certified by the reporter. The office of the writ *coram nobis* is not to be used to test alleged errors of this kind. The testimony before the court at the hearing was amply sufficient to establish the degree of punishment imposed without reference to the reporter's transcript. There is no merit in the claim that the transcript shows that all or any of the confessions of Forbes or Mrs. Nelson were improperly obtained. On the contrary, they are exceptionally free from suspicion that they were obtained by promise of immunity or reward, or coerced by menace, duress or any other fraudulent practice.

Upon the foregoing verified petition the matter came before Honorable Frank M. Ogden, Judge of the Superior Court of Alameda County. Emile Grossman, one of Forbes' counsel, made an affidavit in support of the petitioner. He includes in his affidavit a letter dated January 14, 1933, addressed to Judge Wood, in which nothing important appears other than his anxiety as to the result of the proceeding. He complained that testimony was to be received to determine the punishment. He said that he could see no purpose for taking testimony and that such action indicated to him that Mr. Wehr, who had charge of the prosecution of the case, intended to ask that the death penalty be imposed. He also wrote that before Forbes withdrew his double plea Mr. Wehr assured the attorneys for the defense that he would recommend life imprisonment if they could persuade Mr. Heafey, the attorney for Mrs. Nelson, to withdraw her plea of not guilty by reason of insanity. This he avers Mr. Heafey refused to do, and Mr. Wehr indicated he would accept a plea of guilty of murder of the second degree if she would withdraw her plea. Affiant avers that he and Judge Wood engaged in conversation for at least one-half hour discussing the withdrawal of pleas of not guilty by Forbes and entering a· plea of guilty instead. He also

averred that Judge Wood expressed his personal opposition to the infliction of capital punishment and stated that his mind was unalterably fixed on the subject. At the conclusion of the conversation Judge Wood said: "After all, I cannot prevent the defendant Claude Forbes from withdrawing his present plea." Affiant thereupon stated that he would immediately take the matter up with Forbes and would advise him, due to Judge Wood's assurance of being opposed to capital punishment, to withdraw his plea. He went to the county jail immediately thereafter and advised Forbes that in view of Judge Wood's views on capital punishment, to withdraw his former pleas and enter a plea of guilty. Forbes, according to Grossman, was very dubious for a time and would not consent, but after receiving his assurance that there was no possibility of receiving the death penalty, he agreed to withdraw his pleas. Affiant communicated his conversation to Mr. Boyarsky. Feeling assured that the matter would turn out as he anticipated he did not appear in court at the time fixed for imposing sentence. Affiant avers that when he entered Judge Wood's chambers, which open to the courtroom, he closed the door after him, but Judge Wood immediately opened the door and remarked that he always kept his door open, as he considered the chambers a part of the courtroom, which is public; that Judge Wood required affiant to pledge himself to secrecy as to all that had occurred. He further said he did not want the matter to get to the newspapers and that he did not believe the people waiting in the courtroom could have heard what was said by him and Grossman. The affiant closes with the averments that the affidavit dated January 20, 1933, contains the first public statement of the matter that happened in Judge Wood's chambers, and that he would not have advised Forbes to change his plea "had it not been for the statements made by Judge Wood aforesaid and the reliance of affiant and Claude Forbes thereon". Affiant admits that at least two other persons having business with the judge entered his chambers while he was there.

H. Boyarsky, associated with Grossman, also filed an affidavit in which he avers that he telephoned to assistant district attorney Charles Wehr, in charge of the prosecution, and attempted to effect a compromise whereby Forbes should plead guilty and receive a life sentence. He, like his asso-

ciate, must have appreciated, under the state of the case, that all reasonable hope of escaping the extreme penalty of the law was slight, and he therefore began to negotiate what each terms a "compromise", whereby Mrs. Nelson was to enter a plea of guilty of murder in the *second degree* and Forbes was to receive a life sentence. According to his affidavit he opened negotiations with Mr. Wehr, the attorney in charge of the prosecution, and Mr. Wehr stated that he would be willing to recommend a plea of second degree murder for Mrs. Nelson and would recommend a life sentence for Forbes if he, Boyarsky, could persuade Mr. Heafey, attorney for Mrs. Nelson, to induce her to enter such a plea. That Mr. Heafey refused to entertain the proposition. Mr. Heafey has made no affidavit in the case corroborating Mr. Boyarsky, but it does not seem possible that he would have refused to accept such an offer. Mr. Wehr's affidavit absolutely denies that he made at any time any statements to Mr. Boyarsky which could possibly justify the averments of Mr. Boyarsky's affidavit. Reference to Mr. Wehr's affidavit will presently be made. Boyarsky does not claim to have had any conversation with Judge Wood as to the withdrawal of said pleas but he repeats the averments of his associate as communicated to him as to veiled secrecy and the other matters set forth in the Grossman affidavit. It will be observed that Grossman does not make a single definite, positive or direct averment that Judge Wood agreed or promised not to impose the extreme penalty of the law on condition that Forbes change his pleas. In fact, it is not denied that Judge Wood hesitantly permitted Forbes to withdraw his pleas of not guilty. His offer to permit Forbes to withdraw his plea of guilty in open court on the day he entered it and his examination of him before its entry as to whether he realized that it might become the duty of the court to impose the death penalty upon a plea of guilty, and whether anyone had intimated to him or given him "any encouragement as to what the court would do in a case of this kind", and petitioner's answer "No", it would seem, is an answer of itself to petitioner's charges based largely upon inferences drawn from questionable premises.

Judge Wood prepared an affidavit which is before us. He avers that on December 9, 1932, Attorney Grossman entered his chambers and closed the door. That he immediately

arose and threw the door open with the remark that he always kept the door open. That Grossman said that he was going to plead Forbes guilty. Affiant replied that he would not do that; that it would be better to let a jury pass upon the case. Grossman then said: "Well, Forbes is guilty, what is the use of putting the taxpayers to the expense of a trial?" To this remark Judge Wood replied, "Well, I don't know as I can prevent Forbes from entering a plea of guilty if he desires to do so." Grossman then said: "Mr. Wehr was willing to recommend life imprisonment for Forbes if we could get Forbes and Mrs. Nelson to plead guilty to first degree murder. He took the matter up with Mr. Heafey, who refused to so advise her. Mr. Wehr said that he might offer a further inducement to Mrs. Nelson. If Wehr was willing to do that I do not see why he should ask for the death penalty if Forbes pleads guilty and saves the expense of a trial. It has been so long since the crime was committed, anyway, that a jury would not give the death penalty."

Affiant made no reply to the above statement that Grossman intended to plead Forbes guilty as he believed that Grossman had no hope of saving Forbes' life if the case went to a jury and he believed the statement was made for the purpose of influencing him. Affiant said to Grossman that if he plead guilty sentence must be pronounced within five days (as the statute requires) after the entry of the plea. He then said to Grossman that if the matter was left to his determination he would prefer to continue the sentence until the jury had passed upon Mrs. Nelson's plea of not guilty by reason of insanity. He further informed counsel that the request for a continuance must come from the defendant himself. Affiant avers that nothing further of importance, to his recollection, was said and that his entire conversation with Grossman did not extend over five minutes; that Grossman was in his chambers for a somewhat longer period, but the conversation was interrupted by the entrance of the clerk of the court and two or three others who had business with the court; that the words "secret" or "secrecy" were not mentioned during the short conversation had with Grossman, and at no time did affiant intimate in any way what disposition he would make of the case if Forbes entered a plea of guilty; that Grossman did not at

any time ask if he would or would not impose the death penalty if the matter were submitted to him, nor was any reference made as to affiant's personal attitude toward capital punishment, or that the newspapers knew it was a fact that he was opposed to capital punishment. He denies that he told Grossman of several or any cases wherein he had refused to inflict the death penalty; denies that Grossman upon leaving his chambers, or elsewhere, said that he would take the matter up with Forbes and advise him to withdraw his former pleas and enter a plea of guilty; denies by specific averments all reference made by Grossman as to the secrecy that should be maintained by Grossman in keeping the agreements from the public and the press or that such subjects were mentioned at all during Grossman's visit to his chambers; denies that he said anything which would indicate or intimate what his judgment in the matter would be, or which would in any way encourage or influence Forbes to change his plea. Affiant avers that Grossman did not at any time manifest any belief that he had been assured that the death penalty would not be imposed.

It is further averred that Attorney Grossman had his stenographer present upon permission of Judge Wood, reporting the proceedings of the eight days' trial of Mrs. Nelson on the insanity plea, and that both Grossman and his associate Boyarsky were frequently present in court and they were therefore well informed as to the kind and nature of the evidence that would be produced against Forbes if he should go to trial before a jury.

Charles W. Wehr, assistant district attorney of Alameda County, has filed an affidavit in the proceeding, in which he states that on or about October 15, 1932, H. Boyarsky, attorney for Forbes, approached him and stated that he desired to plead Forbes guilty if he would recommend to the court a sentence of life imprisonment if he would enter a plea of guilty of murder, and that he stated to Boyarsky "that the murder of Harry Nelson was one of the most cold-blooded and brutal murders in the history of Alameda County; that there were no mitigating circumstances in favor of said defendant, and that no fact existed which would justify your affiant in making such recommendation, and that he would not do so". Attorney Boyarsky replied that the case against Bess Nelson was not nearly as strong as the case against

Forbes and that if affiant would recommend life imprisonment for Forbes upon his plea of guilty that Forbes would testify against Bess Nelson upon her trial. Affiant replied that he would not call Forbes as a witness under any circumstances; that he would not vouch for his credibility; that Forbes, "in the home of Harry Nelson, under the guise of friendship, seduced deceased's wife, had broken up deceased's home, had taken deceased's wife and lived with her in adultery, had decided to murder Harry Nelson in order to secure the Nelson home, and for the purpose of collecting the life insurance upon Nelson's life, which amounted to $11,500.00, had entered Nelson's home in the nighttime and beaten him to death with a club in his own bed as he slept; and that it should be apparent to Boyarsky, without argument, that neither affiant nor anyone connected with the prosecution of said case would vouch for the credibility of Forbes, or call him as a witness". Boyarsky asked him if he would submit the proposition to the District Attorney Warren and he said he would not. Affiant told him if both Mrs. Nelson and Forbes would enter pleas of guilty of murder that he would submit the whole matter to his superior officers. Heafey refused to plead Mrs. Nelson guilty of murder and he had no further conversation with Mr. Boyarsky. Affiant denies that he at any time consented to recommend life imprisonment for Forbes upon a plea of guilty. Affiant further avers that he had no information or knowledge that Forbes intended to enter a plea of guilty, and was not in court on the day he entered it.

Other affidavits filed in the case show that the conduct of the attorney and the defendant himself was positively inconsistent with the claim that either of said attorneys for the defendant or the defendant had been given any promise or intimation that Forbes would be relieved of the extreme penalty of the law provided he entered a plea of guilty.

Dr. Walter Rapaport, one of the alienists appointed by the court to examine Forbes and investigate his sanity upon his plea of insanity, avers that on January 16, 1933, Herman Boyarsky, one of the attorneys for Forbes, called him up by telephone, the day before sentence was to be imposed, and asked his assistance in Forbes' behalf, stating that he was having trouble in getting testimony that he could use in mitigation of the crime. He requested the alienist to testify

as to Forbes' low grade of mentality, as he was afraid that he would hang. Upon being informed that his testimony would not help Forbes, Boyarsky said, "I do not know what I am going to do because I have been unable to get any testimony that I could use that would influence the court to be lenient in the case."

M. F. Enos, the bailiff who conducted Forbes from the county jail to the courtroom, avers that the defendant did not at the time sentence was imposed upon him evince any surprise or emotion nor did he make any statement indicating that he had expected or was promised a lesser degree of punishment than that which he received. When returning to the jail after sentence was pronounced Bess Nelson, from an upstairs window, called, "Oh, Claude, what did you get?" Forbes, looking up at her, indicated by drawing his finger across his throat.

The affidavit of the clerk of the court is to the effect that Grossman's conversation with the judge in his chambers could not have exceeded ten minutes and that he and others interrupted his stay several minutes; that he heard none of the conversation referred to in Grossman's affidavit.

Boyarsky filed a rebuttal affidavit in which he either directly denied or made some qualification of the averments as set forth in the affidavits of Assistant District Attorney Wehr and Dr. Rapaport.

Upon the foregoing proceedings we are requested *ex gratia* to nullify the solemn judgment of the court which rendered judgment of sentence, and the court which heard the matter on petition for a writ of error *coram nobis*. Unless it can be said as a matter of law that the court abused its discretion it is not within the power of this court to disturb the judgment. The petitioner was given the alternative by the code of the state of pleading guilty or standing trial. After long deliberation he elected to change his pleas of not guilty and not guilty by reason of insanity to a plea of guilty. His situation was desperate and he elected, with the advice of counsel, to chance his fate with the court rather than a jury, a privilege expressly given by law. He hoped, of course, to win some favor by his change of plea or he would not have made it. He was admonished by the court to disabuse his mind of any hope that the plea of guilty would influence the court to mitigate the penalty if the killing was committed

with the intent and in the manner for which the law exacts the extreme penalty.

What vicious motive could have moved the trial judge to have tricked petitioner into entering a plea which would have enabled him to satisfy a lust for imposing the death penalty is not suggested, and we are unable to attribute such a heinous and unnatural act to any human being except upon most satisfactory evidence. Such a finding was not, as found by the trial judge, justified by the evidence and circumstances adduced in the instant case.

*People* v. *Dabner,* 153 Cal. 398 [95 Pac. 880, 881], was a case very similar in several important respects to the one at bar except the killing in that case was not as merciless as the killing in the instant case. Siemsen and Dabner had planned to rob a Japanese bank located in San Francisco. Dabner was but a youth, aged eighteen years. Siemsen was his senior. They entered the bank in the daytime and inveigled its manager into a back room with the pretense of transacting business with him. While there Siemsen assaulted him with a piece of gas pipe, which one of them had concealed on his person, so violently that he died from the effects thereof. Another employee was called to the rear room by Dabner and he was also beaten into insensibility, Dabner assisting in the assault. Siemsen and Dabner were apprehended and while held in detention Dabner confessed to the crime. Upon arraignment Dabner pleaded guilty to murder. The court heard evidence to enable it to determine the degree of the crime and upon the evidence determined it to be murder of the first degree without mitigating circumstances, and punishable with death. When subsequently brought before the court for judgment and sentence upon the said plea, the defendant asked leave to withdraw his plea of guilty and enter a plea of not guilty to the charge. Evidence and affidavits in support of and in opposition to this application were introduced. The court refused to allow the withdrawal of the plea of guilty and pronounced judgment and sentence of death. The appeal was taken from the judgment. In support of the application to withdraw the plea of guilty, substitute a plea of not guilty, and go to trial before a jury, it was shown that the defendant was only eighteen years old, had resided near Petaluma until a few months before the crime was committed and had borne a good

reputation, and that he was not strong-minded, but was easily influenced by others. It was also claimed that he was insane. The grounds of his motion were that his plea of guilty was made through inadvertence, without due deliberation, in ignorance of the law and the consequences of his plea, in obedience to the advice and instruction of his father, and in the belief that if he made that plea, a jury would be called to fix his punishment and that he would be sentenced only to life imprisonment. Evidence was given tending in some degree to support some of these grounds. An attorney was appointed to represent him upon arraignment and he was given two days to consider his plea. At the expiration of the two days other counsel were appointed to act as his attorneys and the case was continued for two days more. After demurrer overruled his attorneys stated to the court that the defendant, against their advice, wished to plead guilty and they wanted to withdraw from the case. The court then went fully into the matter of his plea and fully informed defendant of his rights and what consequences might follow his plea of guilty, whereupon he stated that he wanted to plead guilty as it was the advice of his father. His plea of guilty was entered, his attorneys withdrew from his case and when he came up for judgment and sentence he made application for leave to withdraw his plea of guilty, which was denied. This court, after a full review of the facts of the case, said:

"It must be conceded that the court justly concluded that the defendant made his plea after ample time for deliberation and not in ignorance of the law, or facts, nor of the course of procedure to be followed, and with full knowledge thereof. Doubtless he was prompted by the hope that he would escape death and be condemned only to imprisonment, and he seems to have been induced to indulge. this hope largely by the suggestions and advice of his father. But we do not think this fact of sufficient force to have required the court to permit a withdrawal of this plea after the event had proven that his hope was vain. If this were so, then the punishment upon a plea of guilty must always be something less than the greatest allowed by law, for the defendant, in pleading guilty, always hopes for less, and if his disappointment was sufficient to give the right to withdraw the plea, it would, in such a case, always be withdrawn. It was not

until the court had declared that the penalty would be death, and after a subsequent delay of six days, that the defendant applied to withdraw and change his plea.

"There was no contention to the effect that there was any serious doubt as to the defendant's guilt, or that evidence could be produced which would tend to prove that the offense was anything less than murder of the first degree, or even to mitigate its atrocity and lay the foundation for a verdict of imprisonment for life, except the claim that the defendant was insane and that prior to his departure from Petaluma, ten months before the time of sentence, he had borne a good reputation for honesty, integrity, and good behavior. The evidence of his insanity was very slight, but nevertheless the court appointed three physicians to examine him in that respect and they unanimously pronounced him sane. His previous good character might have some bearing on the fact of his participation in the crime, if that were in doubt, but there is no pretense that he did not aid and assist therein with deliberation and previous knowledge of the character of assault which was to be made. A cold-blooded, cruel, and deliberate murder is not rendered any the less atrocious by the fact that the person committing it was previously of good reputation.

"Section 1018 of the Penal Code provides that the court may at any time before judgment permit the withdrawal of a plea of guilty and a substitution of a plea of not guilty. It is a matter within the sound discretion of the court, and its action must be upheld unless an abuse of discretion is shown. The following remarks of the court in *People* v. *Miller,* 114 Cal. 16 [45 Pac. 987], are particularly applicable here: 'The mere fact that a defendant, knowing his rights and the consequences of his act, hoped or believed; or was led by his counsel to hope or believe, that he would receive a shorter sentence or a milder punishment by pleading guilty than that which would fall to his lot after trial and conviction by jury, presents no ground for the exercise of this liberal discretion. (*People* v. *Lennox,* 67 Cal. 113 [7 Pac. 260].) To hold that it did would be equivalent to saying that a defendant might speculate upon the supposed clemency of a judge, with the right to retract if, at any time before sentence, he began to think that his expectation would not be realized. . . . Only after it is made manifest that

defendant is to suffer the extreme penalty, and that no further delay will be permitted, do counsel produce the affidavit, itself made upon the day of the hearing but not offered until that moment, and ask to be allowed to retrace all these steps thus advisedly taken. What conclusion can be reached except the one that because the court was about to pronounce sentence of death, defendant and his counsel, knowing that he could not fare worse at the hands of a jury, and might fare better, sought an opportunity to essay the other chance.'

"If we could perceive anything in the evidence which would have called for a lesser punishment than that the trial court was about to impose, some reason might appear why defendant should have been permitted to withdraw his plea and put his fate before a jury. No showing of this kind is made.

. . . . . . . . . . . . .

"His voluntary confession does not lessen or soften the character of his crime. But, whatever its effect may be, it was addressed to the discretion of the court below, and it is not of sufficient weight to control our action to such an extent as to justify us in declaring that that discretion was abused. The responsibility in such matters rests upon the superior court. This court has no function to perform regarding it, except to see that the discretion of that court is not unreasonably exercised. As a matter of law the action of the superior court is justified by the facts . . . ''

All that was said in the Dabner case is singularly applicable to the instant case. Petitioner was not lacking in understanding, as a perusal of his confession and statements will show, and there were no mitigating circumstances which tended to lessen the punishment prescribed by law.

The order appealed from is affirmed, and the writ is denied.

Thompson, J., Curtis, J., Preston, J., Waste, C. J., and Langdon, J., concurred.