[Crim. No. 4609. In Bank. Sept. 25, 1945.]

THE PEOPLE, Respondent, v. ANTONIO SANTIAGO MENDEZ, Appellant.

Walter L. Gordon, Jr., for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SHENK, J.—Defendant was convicted of first degree murder on his plea of guilty and sentenced to pay the extreme penalty. This appeal is automatic pursuant to section 1239(b) of the Penal Code.

The information charged that the defendant, "on or about the 11th day of July, 1944, at and in the County of Los Angeles, State of California, did willfully, unlawfully and feloniously, and with malice aforethought, murder one Maude Pearl Farrington, a human being." At his arraignment the defendant appeared without counsel and the public defender was appointed to represent him. Thereupon a plea of "not guilty" was entered. At the time the case was called for trial his counsel stated to the court that the defendant desired to withdraw his plea of not guilty and enter a plea of guilty. The following then took place:

"THE COURT: Mr. Mendez, you have considered that matter carefully, have you?

"THE DEFENDANT: Yes, I have, your Honor.

"THE COURT: You have advised with your attorney, Mr. Hill?

"THE DEFENDANT: I did talk it over with him.

"THE COURT: You feel, because you are guilty, that you want to plead guilty, and that you want the court to hear evidence to determine the degree of your guilt; is that correct?

"THE DEFENDANT: That is correct, your Honor.

"THE COURT: You have been fully advised, so the District Attorney may rearraign you."

Upon his rearraignment the defendant pleaded guilty. The court proceeded to take evidence to determine the degree of the crime and to fix the penalty. (Pen. Code, § 1192.) It considered all of the evidence including the defendant's pretrial statement and his testimony on the stand. As a witness the defendant admitted that the homicide was by his hand but sought to refute the circumstances strongly pointing to premeditated murder by an attempted demonstration that the killing was accidental. The trial court discredited his explanation, found him guilty of murder in the first degree, and imposed the death penalty.

The defendant makes two preliminary contentions. ▮ The first is that the court erred prejudicially in accepting his plea of guilty without admonishing him of the gravity of such a plea and the possible consequences thereof.

There is no statutory requirement in this state that any special admonition be given by the court when accepting a plea of guilty. Section 1018 of the Penal Code provides, for the defendant's protection, that a plea of guilty ''can be put in by the defendant himself only in open court.'' Further protection is afforded by the same section in the provision that the court may, at any time before judgment, permit the plea of guilty to be withdrawn and a plea of not guilty substituted; and by section 1192 of the Penal Code which provides that the court on a plea of guilty before passing sentence must determine the degree of the crime. From an examination of the defendant the court was satisfied that he had advised with counsel, and that the plea was free and voluntary. Cases cited by him indicate that more was not required. (See *State* v. *Johnson*, 21 Okla. 40 [96 P. 26, 22 L.R.A.N.S. 463] and cases cited in note.) The court's acceptance of the plea after such examination cannot be deemed to have prejudiced the defendant's rights.

Furthermore, the defendant did not ask to be relieved of his plea of guilty. He made no contention that he was given any inducement or promise by anyone. He does not now assert that his plea of guilty was not in accordance with his free and voluntary desire or that it was made without a realization that the law must take its course should his explanation be discredited. The cases he relies on do not help him. In *People* v. *Gilbert*, 25 Cal.2d 422 [154 P.2d 657], it appeared that the defendant's plea of guilty was induced by his counsel's representation of a supposed ''guarantee'' from the trial judge that he would impose only life imprisonment. This court recognized that the sentence of death, once pronounced, is a solemn judgment which cannot lightly be vacated or modified; that while the court will not enforce a judgment which has been procured by fraud, duress, or any force operating to preclude the defendant's free will, neither will a schemer be permitted to trifle with its processes; that the defendant may gamble only at his own risk on the result of a plea of guilty when it is entered through the exercise of his judgment unaffected by fraud, duress, or similar motivating influence; and that if he claims such overreaching he must

establish it by proof. It is not urged that there is any evidence which would meet that burden in this case.

Neither is the situation involved in *People* v. *Griggs,* 17 Cal.2d 621 [110 P.2d 1031], presented here. There the defendant sought to withdraw his plea of guilty to a charge of murder. His application was denied and the death penalty was imposed. The refusal to grant the permission sought was held to be an abuse of discretion in view of the circumstances in evidence which were consistent with either accident or murder. Here it must be said that the defendant's version of an accidental happening is not consistent with the physical facts. The only motive of the defendant in pleading guilty was that he hoped the court would believe his story and that therefore he would be treated with leniency. There is no circumstance disclosed by the record which would indicate that he would have fared differently had he decided to leave his fate with a jury under the plea of not guilty. (See *People* v. *Forbes,* 219 Cal. 363 [26 P.2d 466] ; *People* v. *Lennox,* 67 Cal. 113 [7 P. 260].)

The defendant's second contention is that the charge as worded in the information foreclosed a finding of anything more than second degree murder. His theory is that the court could not convict him of first degree murder unless the information so specified, that is, that the language defining first degree murder—willful, deliberate and premeditated—must appear as part of the charge of murder.

Murder is defined by section 187 of the Penal Code as the "unlawful killing of a human being, with malice aforethought." The degrees of murder are defined by section 189. First degree murder is all murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem. All other kinds of murder are of the second degree.

The charge, which was substantially in the language of section 187 defining murder, was sufficient. (Pen. Code, § 952; *People* v. *Witt,* 170 Cal. 104 [148 P. 928].) The degree of the murder was not required to be included in the charge. It is an issue of fact for the jury under the plea of "not guilty" (Pen. Code, §§ 1041, 1042). It is a matter, together with the penalty to be imposed, which must be determined by the court on competent evidence before passing

sentence under a plea of "guilty" (Pen. Code, § 1192; *People v. Bellon,* 180 Cal. 706 [182 P. 420] ; *People* v. *Gilbert,* 22 Cal.2d 522 [140 P.2d 9] ; *People* v. *Paraskevopolis,* 42 Cal.App. 325 [183 P. 585]). Under the charge as worded in the information either the jury or the court, exercising their respective functions, could find that the defendant was guilty of first degree murder if the evidence warranted that finding.

■ The principal contention of the defendant is that the evidence was insufficient to justify a finding of first degree murder.

About 6:15 a. m. on Tuesday, July 11, 1944, the lifeless form of Maude Pearl Farrington was found lying near a dump of tin cans, and some brush and trees, about five or six feet off El Segundo Boulevard, 600 feet west of Central Avenue in the city of Los Angeles, an unilluminated intersection. There was jewelry on her person and the body was clothed except that the dress was drawn up around the neck and shoulders, leaving the lower portion of the body exposed. Death was caused by either of two gunshot wounds. One bullet entered the right temple near the ear inside the hair line and lodged in the brain. The other entered the skull through the left ear lobe, missed the ear canal, and made an exit through the top of the head. There were powder burns at each entrance wound. A test indicated the presence of spermatazoa in the vaginal vault.

Maude Pearl Farrington, familiarly known as "Jean," was a member of the white race and forty-four years of age. She had been employed as a saleswoman in a Los Angeles department store. She was married but was separated from her husband and lived in a home for women on West 25th Street in Los Angeles.

The defendant, forty-four years of age, and of mixed Spanish and Negro blood, at one time a professional dancer, was employed as an elevator operator at the same department store. He resided with his wife, a colored woman, in a house on West 36th Street. .

Upon his apprehension at his residence at 7:30 p. m. on July 12, 1944, after he had returned from his employment, the defendant admitted that he was acquainted with Jean Farrington, but denied that he was away from his home during the night of July 10th, that he had talked with Jean on the telephone, had seen her on that evening after 5 o'clock, or that he had possessed a gun. He was taken into custody

and confronted with a refutation of his denials, which in part was furnished by a white girl named Marion. He asked to talk with Marion. After a private conversation with her and on the officers' assurance that Marion would not be booked, he admitted the ownership of a gun and that bullets from the gun, while it was in his hands, killed Jean Farrington on the early morning of July 11th. But he claimed that the gun was accidentally fired. He directed the officers to a storm drain at 36th and Normandie Streets where a .32 Colt automatic had been hidden. Caught in the recoil mechanism of the barrel were some strands of hair which matched the decedent's hair. There were six live cartridges remaining in the gun which was capable of holding nine. The deceased's rolled up coat, and the defendant's wadded bloodstained trousers, shirt and shorts were recovered from inside other storm drains. The deceased's purse and a robe taken by defendant from his home on the evening of July 10th were not found. There were blood marks on the defendant's car and evidence of his having used water to clean it on his return home at 3 o'clock on the morning of July 11th. On that day he instructed his wife, if inquiry be made, to say that he had remained at home the previous night.

Marion lived on West 37th Street. On an evening in the latter part of February or early March, 1944, the defendant's car, a black 1937 Pontiac two door sedan, was parked near the home of Dr. Guenther, a physician, at 3879 West Vernon Avenue, a section of Los Angeles known as "View Park." From the doctor's home on a hillside and the place where defendant's car was parked, looking toward the east, there is a view of the city. There were some vacant lots and open fields surrounding the residence. Mrs. Guenther had noticed a car similarly parked on several previous occasions. She had had some difficulty with prowlers and on this occasion she walked out to the curb and flashed a light on the defendant's car. The defendant backed it up to where she was standing and the two engaged in a conversation during which the defendant introduced himself as "Tony" and his companion as a "friend of mine, Marion," stating that for the last year or year and a half they had parked there two or three times a week to sit and look at the view. He offered to help Mrs. Guenther if she had any more trouble. The defendant learned that Dr. Guenther resided in that home on the hillside. On the opposite side of the house there is a drop past some

vacant lots into Presidio Drive and Kenway resulting in a dead-end pocket formation.

On the night of July 10th, Dr. Guenther arrived home at fifteen minutes to twelve and retired. Between 1:15 and 1:30 Mrs. Guenther heard two shots coming in rapid succession from the direction of the Kenway dead-end. About ten seconds later she heard a third shot. Ten minutes later she heard a motor running. She went to the window and saw an automobile with gleaming headlights proceeding away from the hill along Kenway. She reported the matter to her husband the following morning.

The defendant pointed out to the officers the spot on Presidio near Kenway where he and the deceased had sat and talked in his parked automobile on the night of July 10th. He made a statement which was recorded in stenographic notes and transcribed. His statement was substantially the following: He had known the deceased for about four months. They had been intimate and on several occasions prior to July 10th had occupied a hotel room in the late afternoon after working hours. His purpose in taking Jean for a drive at night for the first time was to inform her that their relationship must be terminated because it was causing complications in his life. They had theretofore discussed the matter. After they arrived at View Park they talked in a friendly manner for a while in the front seat. He then opened the glove compartment, and the fully loaded .32 Colt automatic fell forward. He usually kept the gun at home under the mattress, but since the previous 4th of July weekend it had been in his car. Each of them reached for the gun, but he obtained it and put it in his jacket pocket. Neither of them had been drinking. They retired to the rear seat, continued their conversation, and engaged in an act of sexual intercourse. When he told her their relationship should cease, she became angry, and he discovered that she was holding the gun which she had taken from his pocket while pressing close to him. She pointed the gun at him and he fought with her for its possession. They struggled on the floor between the front and back seats. He seized the stock and the gun fired accidentally while it was pointed toward the left side of her head. Her head jerked and he realized the bullet had struck her. He turned on the light and called her by name. He then sat in the driver's seat and lighted a cigarette. He started to drive away. He heard a movement in the car. He

made a "U" turn at the intersection, headed back toward the same location and stopped the car. He sat in the rear of the car and lighted another cigarette. His hand touched the gun which was lying on the back seat. He started to throw it out the window when he noticed it was jammed, so he began pulling the top slide back and forth. He hit it a certain way between his knees and it fired again, accidentally he said, and must have hit Jean in the head. He drove away without seeking aid. At El Segundo and Central, which is more than eleven miles traveling distance from Presidio and Kenway, he decided to take Jean's body out of the car. He touched her wrist, found no pulse, and placed her body where it was found that morning. He then drove toward home, stopping on the way to take off his trousers, shorts and shirt, which were wet with blood and which he threw out of the window of the car. Along the way he also threw out Jean's coat and purse. He placed the gun in a culvert at 36th and Normandie where, at his direction, the officers found it. When he arrived home he cleaned the inside of the car with a hose and water before he went to bed. He arose that morning about 7:15 and after breakfast took his wife to her employment and went to work as usual. That night he gave the inside rear floor of the car a second coat of "walnut" varnish. He had given it the first coat on the previous Sunday and left the carpet off the floor.

In his testimony at the hearing to determine the degree of murder and to fix the penalty the defendant attempted to reconcile inconsistencies between the facts as he related them to the officers and as they appeared from the physical facts. Some of his explanations will be noted.

In the statement to the officers he said that Jean took the gun from his jacket pocket while nestling up to him on the back seat. On the stand he stated that he had placed his jacket across the back of the front seat with the gun in it, that he stepped out to rearrange his clothing after the act of sexual intercourse, and when he reentered he saw Jean's right hand rise and point toward him with an object in it which in the dark he instinctively felt was the gun; that there was a seven to ten minute struggle for possession of the gun which fired while both had hold of it; that the description in his prior statement was incorrect.

In his statement to the officers he had said that while he still had hold of the gun after it fired, he turned the light on in the car and saw that Jean was bleeding from the head; that

he got into the front seat; that the gun was on the back seat; that after he made the "U" turn he stopped the car and returned to the back seat, his hand touched the gun, which he started to throw out the window, when he noticed it was jammed; that the gun had some grease on it and the second shot fired while he was trying to work it out of the jam. On the stand, after he heard the testimony concerning the strands of hair caught in the recoil mechanism, he testified that the gun was not lying on the back seat, but that it had caught in Jean's hair; that when he changed to the front seat he left it near her head, partially on the back seat; that by "jam" he meant that the gun was caught in Jean's hair, and that it was while he was trying to disengage it from her hair that the gun "went off" striking her again—this time through the right side of the head.

In his statement to the officers he also said that he knew Jean was alive after the first shot and that he didn't seek medical aid for her because of his confused mental state. On the stand his testimony was that the "movement" he heard in the car as he first drove away from the scene was merely the shifting of the body with the motion of the car.

He corrected his statement that he "threw" his trousers "out the window" by stating he would not deny that he secreted them in a storm drain; that he knew he threw them out of the car but how or why, he didn't know, with the same explanation of his prior statement that he also threw his shorts and shirt out the window.

On the stand on cross-examination the defendant testified that conversations concerning the termination of their relationship had commenced before June 17th and that Jean had requested an explanation. He denied that he loved Jean or had ever communicated to her that he loved her. He changed his testimony when he was confronted with two letters dated respectively June 11 and June 17, 1944, in his own handwriting, addressed and delivered to Jean, in which he spoke only of his love for her, of the happiness of the moments spent with her, of his desire to be with her and of his hope of what the future would hold for him, with no hint of any rift in their relations.

The defendant relies on several recent decisions of this court to support his contention that the evidence is insufficient to sustain a conviction of murder in the first degree. But the record herein discloses facts which render the conclusions in those cases inapplicable.

In *People* v. *Howard,* 211 Cal. 322, [295 P. 333, 71 A.L.R. 1385], the court reduced to second degree murder, a judgment of conviction entered on a jury's verdict of first degree murder without recommendation. In that case the defendant confessed that he struck the decedent, his employer, with his mechanic's hammer in a struggle ensuing after decedent had upbraided him for remaining away from his night duties at the automobile rental garage, and wherein the defendant, after discovering the decedent's semiconscious condition, had notified the authorities.

The defendant herein relies on language in that case to the effect that if the confession be disregarded the record was destitute of evidence tending to establish the circumstances and conditions actually existing prior to and at the time of striking the fatal blow and from which it might reasonably be concluded that there was murder wilful, premeditated and intentional. He contends that in his case likewise the court should have found the crime to be that of murder in the second degree.

We cannot so determine. The physical facts and circumstances here disclosed furnish ample evidence from which the court could conclude beyond a reasonable doubt that the defendant's murderous dispatch of the decedent was wilful, premeditated and intentional. Instead of taking her, as he had taken Marion, to converse and look at the view on the east side of the hill in View Park, he parked his car in a somewhat isolated pocket on the opposite side of the hill. There was a gun in the car; but even more inexplicable, if the defendant's version could be credited, is the fact that he had the gun on or near his person while he intimately embraced her, a situation indicated by the condition of the decedent's body. A witness heard the shots from that gun, and the number and succession of the shots as heard do not tally with the story told by the defendant nor with any theory of accidental firing. His companion was supposedly in need of medical aid and the defendant knew that a doctor resided in the locality, but he made no effort to obtain aid. Instead he fired the gun a second time and then drove a considerable distance away from a place where he was known to another and far distant isolated section where he deposited the lifeless body among some trash and brush in a position and attitude as though it had been subjected to an act of rape followed by murder. He attempted concealment of all telltale evidence,

even to coating the rear floor of his car with varnish both before and after the homicide. He gave instructions to his wife, which, if followed, would tend to establish an alibi. These facts and circumstances do not lend credence to the defendant's story of accidental shooting in a struggle to dispossess the decedent of a gun assertedly pointed by her for his own destruction following their intimate embrace, nor to his claim of confused mental processes after the so-called "accident." Without the defandant's assertions of accidental shooting, the circumstances point to murder in the first degree. Coupled with his assertion that Jean was causing complications in his life and that their relationship must be terminated, the court was justified in finding a motive for the murderous intent.

Unlike the situation in the Howard case, therefore, the circumstances are not consistent with the defendant's explanation of the homicide. Other cases relied on are distinguishable on similar grounds. In *People* v. *Holt,* 25 Cal.2d 59 [153 P.2d 21], this court reduced to second degree murder a judgment entered on a jury's verdict of guilty of first degree murder without recommendation. It was the opinion of the majority of the court that the record as a matter of law did not justify the application of the statutory standard and that to warrant imposition of the penalty for first degree murder the circumstances must show a wilful, deliberate and premeditated intent to take life. Such a situation was, by the majority of the court, deemed to exist in the case of *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7], so as to render prejudicially erroneous certain instructions to the jury on the degrees of murder.

In this case, the state of the record justifies the trial court's declared opinion that the story told by the defendant was neither candid nor truthful. As recognized in *People* v. *Thomas,* and in *People* v. *Holt,* the weight of the evidence is for the trial court; and where, as here, there is no reasonable basis for a declaration that the evidence is insufficient as a matter of law to meet the applicable standard, an affirmance must follow.

The judgment is affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Schauer, J., Traynor, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied October 25, 1945.