[No. A024259. First Dist., Div. Four. July 18, 1986.]

THE PEOPLE, Plaintiff and Appellant, v.
BOBBY JOE BUCKLEY, Defendant and Respondent.

514

**COUNSEL**

John K. Van de Kamp, Attorney General, Linda Ludlow and Morris Lenk, Deputy Attorneys General, for Plaintiff and Appellant.

James R. Jenner, Public Defender, David L. Andersen and Scott A. Sugarman, Assistant Public Defenders, for Defendant and Respondent.

**OPINION**

**SABRAW, J.**—This is an appeal by the People from an order dismissing the information pursuant to Penal Code[1] section 995. The evidence which was introduced at the May 11, 12 and June 3, 1983, preliminary hearing may be summarized as follows:

At approximately 8:30 p.m. on the evening of January 11, 1983, members of the Oakland Police Department conducted a search pursuant to warrant at 1717 Peralta Street, Oakland. The purpose of the search was to uncover evidence of illegal drug trafficking. Entry into the residence was made at about 8:35 p.m. Since the officers were aware of the hazard of the operation, they were armed and also wore Oakland Police Department raid jackets. The raid jackets are of navy blue color with large yellow letters "POLICE" on the front and "OAKLAND POLICE" on the back. In addition, the victim, Officer Irizarry, wore a baseball cap with "Oakland Police Department" insignia on it.

The front door of 1717 Peralta is located on an alleyway. While the alleyway was narrow and fairly dark, it received some light from the street so that the features of a person could be recognized in the alley.

At the time the officers entered the residence, there were two people, Rapunzal Boozer and Donell Polk, inside who were subsequently arrested. When the officers were just about ready to leave the apartment, Sergeant Chinn heard a honking of a car outside. Upon hearing the honking, Officer Gremminger, who stood nearby, looked out of the window. He saw a double-parked foreign sports car with a male Black driver on the street in front of the residence. The driver was either bald or had short natural hair and wore a beard and mustache. He was the only occupant of the vehicle.

Sergeant Chinn went to the door and beckoned the driver of the car to come into the apartment. When the driver refused and kept honking, Sergeant

---

[1]Unless otherwise indicated, all statutory references are to the Penal Code.

Chinn and Officer Irizarry left the building to approach the car. Before leaving, both officers fastened their raid jacket buttoned from bottom to top and then started towards the vehicle. While in the alley, they could see the sports car in the street double-parked six to eight feet from the curb in front of the alleyway. Officer Irizarry went several feet ahead; his gun was not drawn. Halfway down the alley Irizarry shouted to the driver in a loud voice: "Police, we want to talk to you." Less than a second later, the person in the sports car drew a weapon and fired at the officers. Sergeant Chinn saw Officer Irizarry falling to the ground and returned the fire. He felt he hit the car and its driver. A few seconds later the car lurched forward and drove southbound on Peralta. As the car began to take off, Sergeant Chinn attempted to memorize the license number of the vehicle. He also observed its driver who was described by him as a male Black, in his 30's, bald and wearing glasses. After the car pulled away, Officer Denson, Healy and Munoz rushed to the scene, Officer Denson firing several shots at the escaping car. In a hot pursuit all four officers jumped into a police vehicle to catch the suspect.

Defendant was arrested on West Grand Avenue at 8:51 p.m. that evening by Officer Endaya. The officer testified that shortly after the shooting, he received a description of the vehicle and the suspect through police radio. He caught up with defendant's Fiat automobile on Telegraph Avenue. After activating his emergency lights and siren, he stopped defendant's car and ordered him out. Upon alighting from the car defendant, bleeding from several wounds, fell to the ground. Officer Endaya noted multiple bullet holes in the car door and also found a blue steel revolver in the vehicle.

The additional prosecution witnesses provided further evidence against the defendant. Donell Polk, who was arrested in the residence prior to the shooting, testified that on the evening of January 11, 1983, he called the defendant and asked him to come over. Deidrea Joan Nichols, a close friend of defendant, identified the Fiat car as hers and stated that on the evening of the shooting she took the car to defendant's apartment so that he could use it. Ms. Nichols remembered that she had seen a "gray" long-barreled revolver in defendant's apartment on January 9, 1983, i.e., two days before the killing. Ms. Nichols also confirmed that the defendant was a "cool headed person" and that he was entirely sober just a few hours before the incident. Lastly, Dr. Herrmann, an expert witness who had performed an autopsy on Officer Irizarry, testified that the cause of death was a bullet wound to the victim's head.

The defense called nine police officers as witnesses. Although none of these officers were outside in the alley and thus were not percipient witnesses

to the shooting, they corroborated rather than contradicted the prosecution evidence.

The first defense witness called to the stand was Officer Denson. He testified that he was a party to the search of 1717 Peralta on January 11, 1983. He said all officers were wearing raid jackets during the search. Standing in the doorway he observed Officer Irizarry and Sergeant Chinn leave the apartment. He confirmed Sergeant Chinn's testimony that before leaving the building Officer Irizarry "was dressed with the cap and the raid jacket as well, and the jacket was buttoned up to the top." Upon hearing the shots, Officer Denson went outside and ran to the sidewalk. He heard from Sergeant Chinn that Officer Irizarry had been hit. Sergeant Chinn pointed to a sports car on the street from where the bullet came. Denson tried to shoot at the car before it drove away.

The second defense witness was Officer Gunar. He stated that he too, participated in the January 11, 1983, search on Peralta. He was inside the apartment at the time the shooting took place. When he went outside, Officer Irizarry was lying in the street with his blue raid jacket on.

The third defense witness, Officer Bachman, was also inside 1717 Peralta when the shooting occurred. He left the apartment when he heard the gunfire in the alley. Once outside, Officer Bachman saw Irizarry lying on the ground. He noticed that Irizarry's raid jacket was all buttoned up. It was Bachman who, with the help of Officer Gremminger, unbuttoned the victim's jacket and removed his vest to help him breathe.[2]

The previous testimonies were corroborated by the fourth defense witness, Officer Gremminger. Gremminger recounted that he was in one of the bedrooms when the honking started. He looked out of the window and

---

[2]The illustrative part of the record reads as follows: (Officer Bachman's testimony.) "Q. Okay. Did you then go to Officer Irizarry? [¶] A. Yes, sir; I did. [¶] Q. Were you the first officer there? [¶] A. Yes, sir; I was. [¶] Q. Can you describe how he was clothed at that time? [¶] A. He had his blue Levi's, I believe, bullet-proof vest, Oakland Police blue raid jacket with yellow lettering, his revolver was out. He was on his back. [¶] Q. When you say his revolver was out, do you know where it was? [¶] A. It was either in his hand or right next to his hand. I do not recall. I picked it up. [¶] Q. I see. *Can you describe how his raid jacket was?* [¶] A. *Yes, sir; his raid jacket was buttoned.* [¶] Q. *Were all of the buttons buttoned?* [¶] A. *Yes, sir; I took his raid jacket off of him and I took his vest off of him.* [¶] Q. Okay. How did you take the raid jacket off of him? [¶] A. I unbuttoned it and then removed the front portion of the bullet-proof vest. [¶] Q. Okay. Did you take his arms out of the sleeves? [¶] A. No, sir. [¶] Q. All right. What was your purpose in unbuttoning the raid jacket? [¶] A. Well, Officer Gremminger arrived shortly after I was there and we had a brief discussion as to what we could do for him and it was decided that maybe if we took and unbuttoned his jacket and removed his vest *that it might help prevent any restriction of air to his throat.* It has a tendency to slide up and rub against the throat area." (Italics added.)

observed the double-parked sports car and its driver. He heard Irizarry yelling in a loud voice "police officers" which was followed by a series of gunshots. Once in the alley, he saw the slain officer on the ground. His raid jacket was "buttoned fully to the top collar." He and officer Bachman "unbuttoned the jacket and removed the front part of the vest so as to free up his breathing. He was having difficulty breathing." Officer Gremminger confirmed that Irizarry was wearing his raid jacket also prior to his stepping outside because "it was one of his traits."

Sergeant Healey, the fifth defense witness, testified that he was in the living room when the shooting started. After the honking, he leaned out of the window and made a waving motion towards the car. There was some light in the alley because he could see the ground and also the right front fender of the car. He reiterated that with the exception of Oku, the probation officer, all officers at the residence were dressed in Oakland police jackets.

The sixth defense witness, Officer Kimzey, testified that he was in the residence when he heard the shots fired. He did not hear the warning "police" because there was music in the living room. He saw Officer Irizarry put on his raid jacket prior to going to 1717 Peralta. Officer Kimzey approached the wounded officer after the shooting. At that time Officer Irizarry's raid jacket "was buttoned from top to bottom."

Following the above-stated exhaustive evidence, defense counsel sought to call three further witnesses, i.e., police Officers Wilson, Munoz and Foley. The prosecution objected to the introduction of additional testimony on the grounds that all three witnesses in dispute were inside the apartment when the shooting incident took place and their testimony would be entirely repetitious and cumulative to the evidence already on record. In all three instances the court requested an offer of proof as to the scope and possible content of the testimony. Defense counsel informed the court that he had no specific questions, but rather intended to examine those witnesses in general pertaining to the issues already inquired into (i.e., where the officers were in the apartment at the time of the shooting; what was the condition of Irizarry's raid jacket before and after the incident; the lighting of the alleyway; whether the witnesses heard Irizarry's warning prior to the shooting, etc.). The court then sustained the prosecution's objections and excluded the testimonies of all three witnesses under Evidence Code section 352 on the stated grounds that the proffered testimony lacked specificity; that they would go only to the credibility of witnesses already testified rather than establishing an affirmative defense or overcoming the prosecution's case; and that they would shed no further light on the case, but rather would be entirely cumulative.

■■■■■■■■■■■■

Based upon the above facts, an amended complaint was filed charging defendant Bobby Joe Buckley (respondent or Buckley) with violation of section 187 and with special circumstance alleging that the victim was a peace officer who was intentionally killed while engaged in the performance of his duties (§ 190.2, subd. (a)(7)).[3] Enhancements for firearm use (§§ 12022.5 and 1203.06, subd. (a)) and great bodily injury (§§ 12022.7 and 1203.075) were also alleged. Following the preliminary examination the magistrate held Buckley to answer for a violation of section 187, but declined to make an explicit finding on the special circumstance and the degree of the murder.

Thereafter, an information was filed in the superior court charging respondent with first degree murder (§ 187) and alleging the same special circumstance and enhancements as were charged in the municipal court. Respondent moved to set aside the information pursuant to section 995 on three grounds: (1) the magistrate erred in refusing to fix the degree of murder and to make a finding on the special circumstance; (2) the evidence was insufficient to show first degree murder and special circumstance; and (3) respondent was denied his right to present witnesses at the preliminary hearing. Following extensive briefings and a hearing, the trial court granted the motion to dismiss the information by concluding that the magistrate erred (1) in failing to fix the degree of murder and (2) in excluding the testimonies of the three police officers from evidence. The People (appellant) filed a notice of appeal from the order of dismissal pursuant to section 1238, subdivision (a)(1).

The principal issue on appeal is whether the dismissal of the information in the present case was justified. Appellant contends that the ruling of the trial court was erroneous because: (1) under established law the fixing of the degree of the crime is for the trier of fact, not for the magistrate whose sole function is to determine whether there is competent evidence to commit the defendant for trial (*Holman* v. *Superior Court* (1981) 29 Cal.3d 480, 484 [174 Cal.Rptr. 506, 629 P.2d 14]; *Prestly* v. *Superior Court* (1958) 50 Cal.2d 812, 819 [330 P.2d 39]); (2) the magistrate made at least an implicit finding with respect to special circumstance allegation; and (3) the exclusion of additional evidence under Evidence Code section 352 was well within the discretionary power of the magistrate, since the evidence in dispute was

---

[3]Section 190.2, subdivision (a)(7), provides that the death penalty or a sentence of life imprisonment without possibility of parole shall be imposed in any case in which the defendant is found guilty of first degree murder and it is charged and specially found to be true that "the victim was a peace officer . . . who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties; . . ."

not offered for the legitimate purpose of overcoming the prosecution's case or establishing an affirmative defense and was clearly cumulative. For the reasons which follow we agree with appellant and reverse the order.

## I. *Specification of the Degree of Murder*

■ For over a century the rule has been firmly settled in California that the specification of the degree of murder is not required in an accusatory pleading. Thus, as early as 1858 the California Supreme Court held that in an indictment for murder it was unnecessary to state the degree of the offense. (*People* v. *Lloyd* (1858) 9 Cal. 54, 55.) About one decade later, the court went even further by concluding that the grand jury, the accusatory body, had no right to determine the degree of murder in the indictment. (*People* v. *Nichol* (1867) 34 Cal. 211, 217, overruled on other grounds in *People* v. *Gorshen* (1959) 51 Cal.2d 716, 732 [336 P.2d 492].) The cases decided subsequently have clarified that the rule set out above is applicable even if the defendant is charged by way of an information rather than an indictment. Thus, it has been consistently held that the murder charge couched in the language of section 187 is sufficient, and that it is not necessary to state the method and degree of the murder in the information. (*People* v. *Golston* (1962) 58 Cal.2d 535, 539 [25 Cal.Rptr. 83, 375 P.2d 51]; *People* v. *Hamilton* (1969) 2 Cal.App.3d 596, 606 [82 Cal.Rptr. 700]; *People* v. *Hawkins* (1978) 85 Cal.App.3d 960, 966 [149 Cal.Rptr. 855].) The rationale of this rule is that the degree of murder is a factual issue to be determined by the jury under the plea of not guilty and is a matter to be taken into account by the court in imposing the sentence. (*People* v. *Mendez* (1945) 27 Cal.2d 20, 23-24 [161 P.2d 929]; *People* v. *Coston* (1948) 84 Cal.App.2d 645, 647-648 [191 P.2d 521].)

■ Respondent nonetheless argues that where, as here, the defendant is charged with murder with a special circumstance, the degree of the murder must be specified by the magistrate. Respondent's argument runs as follows: The criminal defendant has the right to challenge the sufficiency of evidence supporting the enhancement (including special circumstance) allegations by a section 995 motion filed in the superior court. (*People* v. *Superior Court (Mendella)* (1983) 33 Cal.3d 754, 761 [191 Cal.Rptr. 1, 661 P.2d 1081]; *Ramos* v. *Superior Court* (1983) 32 Cal.3d 26, 34 [184 Cal.Rptr. 622, 648 P.2d 589]; *Page* v. *Superior Court* (1979) 90 Cal.App.3d 959, 970-971 [153 Cal.Rptr. 730]; *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944, 953-954 [153 Cal.Rptr. 720].) The first degree murder is a foundational element of the special circumstance inasmuch as the latter attaches only if first degree murder is found. (§§ 190.1, 190.2, 190.4.) Based upon these premises respondent concludes that in the absence of finding first degree murder, the requisite evidentiary support for the special circumstance allegation is miss-

ing and that such allegation is vulnerable to a section 995 attack in the superior court. While respondent's deduction is both novel and inventive, it is lacking in the required legal support and must fail for a number of reasons.

First of all, the relevant statute, section 1157, confirms the general rule that the determination of the degree of the crime is for the trier of fact, not the magistrate, by providing that *"Whenever a defendant is convicted of a crime* or attempt to commit a crime *which is distinguished into degrees, the jury, or the court* if a jury trial is waived, *must find the degree of the crime* or attempted crime of which he is guilty." (Italics added.)

■ Second, contrary to respondent's argument, the decisional law re-affirms rather than refutes the proposition that the defendant need not be specifically charged with first degree murder in order to allege special circumstances. ■ The case in point is *Allen* v. *Superior Court* (1980) 113 Cal.App.3d 42 [169 Cal.Rptr. 608]. In *Allen,* the defendant was charged with murder in the language of section 187, and a special circumstance per section 190.2, subdivision (a)(14), was also alleged. In the superior court the defendant claimed that the special circumstance allegation could not be filed in absence of charging first degree murder. In rejecting defendant's contention the appellate court stated as follows: "It is well established that, *in charging a crime divided into degrees, it is unnecessary to state the method or degree of murder. (People* v. *Risenhoover* (1968) 70 Cal.2d 39, 50 [73 Cal.Rptr. 533, 447 P.2d 925], cert. den. (1969) 396 U.S. 857 [24 L.Ed.2d 108, 90 S.Ct. 103]; *People* v. *Romo* (1975) 47 Cal.App.3d 976, 989 [121 Cal.Rptr. 684], disapproved on another point in *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396]; *People* v. *Hamilton* (1969) 2 Cal.App.3d 596, 606 [82 Cal.Rptr. 700]; cf. Witkin, Cal. Criminal Procedure (1963) Proceedings Before Trial, § 200, p. 189.) The present indictment for murder charges all offenses necessarily included in the crime of murder, including voluntary and involuntary manslaughter. (*People* v. *Heffington* (1973) 32 Cal.App.3d 1, 11 [107 Cal.Rptr. 859].) The question as to what crime, within the ambit of murder, was committed is one for the jury. (See *People* v. *Stansbury* (1968) 263 Cal.App.2d 499, 503 [69 Cal.Rptr. 827]; *People* v. *Coston* (1948) 84 Cal.App.2d 645, 648 [191 P.2d 521].) Furthermore, in capital cases, the jury initially decides the degree of murder and, if first degree is found, then determines whether the offense was attended by one of several special circumstances. *Section 190.2 merely requires a conviction of first degree murder as a prerequisite to application of the special circumstance allegation. There is no requirement that the information allege first degree murder;* only a conviction is re-quired." (*Allen* v. *Superior Court, supra,* at p. 47, italics partially added.)

Third, the cases cited by respondent stand only for the proposition that in order to weed out groundless charges and relieve the accused of the degradation and expenses of criminal trial, the magistrate may dismiss or strike a special circumstance allegation if the evidence presented at the preliminary hearing does not provide sufficient cause for the allegation (*Ramos* v. *Superior Court, supra,* 32 Cal.3d 26, 34) and that the special circumstance allegation may be challenged by a section 995 motion for insufficiency of the preaccusatory evidence. (*Page* v. *Superior Court, supra,* 90 Cal.App.3d at p. 970; *Ghent* v. *Superior Court, supra,* 90 Cal.App.3d at pp. 954-955; accord *People* v. *Superior Court (Mendella), supra,* 33 Cal.3d at p. 761.) Neither *Mendella* nor any other case we know of has ever held, however, that the magistrate is under a duty to find the degree of murder, much less that a lack of such a finding by the magistrate may serve as a basis for setting aside an information under section 995. To the contrary, the cases indicate that with the exception of the sufficiency of evidence (*People* v. *Brice* (1982) 130 Cal.App.3d 201 [181 Cal.Rptr. 518]) the findings by the magistrate are discretionary and also that the prosecution may amend the information and add to the charges in the absence of the findings of the magistrate as long as the evidence received at the preliminary hearing supports the new or amended charges. ■ Thus, citing a number of case authorities *Mendella* states that under section 739 "the law is settled that *unless the magistrate makes factual findings to the contrary,* the prosecution may amend the information after the preliminary hearing provided the new crime is transactionally related to the crimes for which the defendant has previously been held to answer" and that "California law under sections 739 and 1009 and relevant cases permit amendment of the information to add charges or enhancements which are supported by the actual evidence at the preliminary hearing." (*People* v. *Superior Court (Mendella), supra,* 33 Cal.3d at p. 764, italics added; see also *Jones* v. *Superior Court* (1971) 4 Cal.3d 660, 664-666 [94 Cal.Rptr. 289, 483 P.2d 1241]; *People* v. *Manning* (1982) 133 Cal.App.3d 159, 165 [183 Cal.Rptr. 727]; *People* v. *Encerti* (1982) 130 Cal.App.3d 791, 799 [182 Cal.Rptr. 139].)

■ Fourth, respondent's contention that the dismissal of the information is justifiable also for the magistrate's refusal to make an explicit finding on the truth of the special circumstance allegation, is likewise mistaken. ■ It is blackletter law that the magistrate's role is limited to determining whether or not there is sufficient or probable cause to believe that the defendant is guilty of a public offense and that the information may not be set aside if the evidence produced at the preliminary hearing supports probable cause to believe that the defendant is guilty of the offense. (*People* v. *Uhleman* (1973) 9 Cal.3d 662, 667 [108 Cal.Rptr. 657, 511 P.2d 609]; *Walker* v. *Superior Court* (1980) 107 Cal.App.3d 884, 888-889 [166 Cal.Rptr. 209].) ■ In the case at bench the trial court, despite re-

spondent's urging, refused to find that the preliminary hearing evidence was insufficient to support either the first degree murder or the special circumstance allegation. In addition, the record shows that the magistrate did make an implied finding that the special circumstance allegation was borne out by the evidence adduced at the preliminary examination.[4]

## II. *Exclusion of Evidence*

■ Appellant's second major contention that the trial court erred in dismissing the information for the exclusion of the proffered testimonies of Officers Wilson, Munoz and Foley, is likewise well taken.

It has been well established that the defendant at a preliminary hearing has the right to examine and cross-examine witnesses for the purpose of overcoming the prosecution's case or establishing an affirmative defense. (§ 866; *Jones* v. *Superior Court, supra,* 4 Cal.3d 660, 667; *People* v. *Jordan* (1983) 142 Cal.App.3d 628, 634 [191 Cal.Rptr. 218].) ■ However, the defendant may not seek cross-examination or presentation of a witness for the sole and primary goal of obtaining discovery. (*Foster* v. *Superior Court* (1980) 107 Cal.App.3d 218, 225 [165 Cal.Rptr. 701]; *McDaniel* v. *Superior Court* (1976) 55 Cal.App.3d 803, 805 [126 Cal.Rptr. 136].) ■ It is similarly settled that not every error in procedure or erroneous ruling by a magistrate at a preliminary hearing requires that an information be set aside. In order to be reversible the erroneous ruling of the magistrate must affect a substantial right of the defendant. As succinctly stated in *Jennings* v. *Superior Court* (1967) 66 Cal.2d 867, 879 [59 Cal.Rptr. 440, 428 P.2d 304], "Not [in] every instance in which a cross-examiner's question is disallowed will defendant's right to a fair hearing be abridged, since the matter may be too unimportant [citation], or there may be no prejudice [citation], or the question may involve issues which can be brought up at a more appropriate time [citation]." ■ Consistent therewith, it has been said that the evidence at the preliminary hearing is inadmissible where it

---

[4]The relevant part of the record reads as follows: "'MR. ANDERSON [Defense Counsel]: Is the Court then refusing to make a finding on the specials?

"'THE COURT: Counsel, if you push me I would be inclined to make a finding that they are established. . . .

"' . . . . . . . . . . . . . . . .

"'THE COURT: If it appears to me that an enhancement is egregious overcharging in an excess of zeal on the part of the prosecutor, then it is our duty to weed it out. I am not in that position in this case. You have to keep in mind that the last words spoken on this earth by the victim, Officer Irizarry, were as follows: "Police, I want to talk to you," followed by a shot that killed him ultimately.

"' . . . . . . . . . . . . . . . . . . . . . .

"'THE COURT: I think my obligation is circumscribed by a finding, a negative finding, in the face of an open charge, . . . and I do not find that here. In fact, were I given some authority that I must make a finding, I would make a positive finding.

"'MR. ANDERSON: On what?

"'THE COURT: On the special circumstance. . . .'"

"tends only remotely or to an insignificant degree to prove a material fact in the case" (*People* v. *Davis* (1965) 233 Cal.App.2d 156, 161 [43 Cal.Rptr. 357]; accord *People* v. *Cardenas* (1982) 31 Cal.3d 897, 906 [184 Cal.Rptr. 165, 647 P.2d 569]); or where the proffered evidence could not have added any more detail to the evidence already produced; or where the excluded evidence would have been relevant only to the weight of the direct evidence (*People* v. *Stone* (1983) 139 Cal.App.3d 216, 224 [188 Cal.Rptr. 493]).

▇▇ Lastly, it is axiomatic that the trial court (or for that matter the magistrate) has wide discretion to preclude cumulative and time-consuming duplication of inquiry (*People* v. *La Macchia* (1953) 41 Cal.2d 738, 743-744 [264 P.2d 15]; *People* v. *Flores* (1977) 71 Cal.App.3d 559, 565-566 [139 Cal.Rptr. 546]) and that the trial court's decision in excluding evidence under section 352 of the Evidence Code will be disturbed on appeal only if the injured party shows a clear abuse of discretion resulting in prejudice (*People* v. *Vaughn* (1968) 262 Cal.App.2d 42, 48 [68 Cal.Rptr. 366]; *People* v. *Ross* (1969) 276 Cal.App.2d 729, 734 [81 Cal.Rptr. 296]).

▇▇ The dismissal of the information in this case rested in part on the exclusion of the testimonies of three defense witnesses: Officers Wilson, Munoz and Foley. A perusal of the record clearly demonstrates, however, that the evidentiary ruling of the magistrate was either proper or, at the very least, was not prejudicial.

As set out before, the three police officers in dispute were inside the apartment and thus were not percipient witnesses to the shooting incident. It also appears that in his offer of proof defense counsel revealed that he had no specific questions to ask of these witnesses; that he had not interviewed them prior to the preliminary hearing; and that he intended to examine the witnesses only to figure out if their testimony would shed additional light on the case. In other words, trial counsel wished to embark on a broad and unlimited discovery at the preliminary hearing which is well beyond the scope allowed by *Holman* v. *Superior Court, supra,* 29 Cal.3d at pages 485-486. The record also betrays that the inquiry to be made of the witnesses would have covered the same subject matters (attire of Officer Irizarry, the lighting in the alley, the police warning before the shooting, etc.) as had been extensively explored and testified to by the previous witnesses. This, of course, shows that the testimonies to be elicited from the witnesses would have been clearly repetitious and cumulative adding no new dimensions to the case. Finally, respondent failed to demonstrate that he was prejudiced by the exclusion of the testimonies in question.

With respect to the issue of prejudice, it bears special emphasis that following the dismissal of the information the prosecution refiled the complaint in the municipal court charging respondent with first degree murder with a special circumstance. Thereafter, a second preliminary hearing was held (action No. 225784) in the course of which Officers Wilson, Munoz

and Foley were allowed to and did, in fact, testify without any restraint. The transcript of the second preliminary hearing of which we take judicial notice under Evidence Code section 452[5] demonstrates that the testimony of the three police officers was entirely cumulative and only corroborative of the evidence produced by the preceding numerous witnesses.[6] Indeed,

---

[5]Evidence Code section 452 provides in part: "Judicial notice may be taken of the following matters to the extent that they are not embraced within Section 451: . . . [¶] (d) *Records of (1) any court of this state* or (2) any court of record of the United States or of any state of the United States." (Italics added.)

[6]The pertinent part of these testimonies read as follows: *Officer Wilson's testimony*: "Q. Okay. At the point where you first saw Officer Irizarry, was there anyone else around him? [¶] A. Yes, sir. [¶] Q. And who is that? [¶] A. It was Officer Bachman and Officer Gremminger. [¶] Q. Did—you did not see Officer Irizarry exit the apartment; is that correct? [¶] A. No, I didn't. [¶] Q. When you saw him on the ground, can you describe his dress? [¶] A. Yes, sir. He had his raid jacket on and I don't recall what he was wearing for trousers. [¶] Q. Okay. Do you recall the condition of the raid jacket when you saw it as he was on the ground? [¶] A. Yes, sir. [¶] Q. And what was that? [¶] A. It was buttoned. [¶] Q. Do you recall what the officers who were—were doing who were next to him? [¶] A. Yes, sir. They— right after I got there—decided to unbutton his jacket and move his vest down so that they could get some more air to him. [¶] Q. Okay. And you observed this? [¶] A. Yes. [¶] Q. Prior to the point where they began to remove the jacket, can you describe how the jacket was unbuttoned? [¶] A. It was buttoned to the top, I believe. [¶] Q. Can you recall, can you remember Officer Irizarry's position at the time you got to 1717 Peralta? [¶] A. Yes, sir. He was lying in the gutter halfway into the curb as I recall. [¶] Q. Do you recall seeing his gun at that point? [¶] A. No, sir."

*Officer Munoz' testimony*: "Q. Did you ever have occasion to look out a window that was in that bedroom? [¶] A. No, I did not. [¶] Q. Did the car continue to honk, or was there a pause and then more honking? [¶] A. There was a pause. It stopped for a short period of time then it started honking again. [¶] Q. Okay. Can you recall how warm it was within that apartment that evening? [¶] A. It was warm. I don't know how warm it was. [¶] Q. Did you take off your raid jacket and—because of the heat? [¶] A. No. I never take my raid jacket off. [¶] Q. Did you unbutton it at all? [¶] A. No. [¶] Q. Did you have occasion to see Officer Irizarry during the course of your search of this bedroom? [¶] A. No, not that I recall. [¶] Q. Did you happen to notice if any of the other officers took off their raid jackets or unbuttoned their raid jackets? [¶] A. I don't recall. . . . [¶] Q. Do you recall approximately for how long the horn was honking? [¶] A. No, I don't. [¶] Q. Now you travelled to the scene with Officer Irizarry? [¶] A. Yes. [¶] Q. Can you recall how he was dressed? [¶] A. He was dressed basically the same way we were. [¶] [Off-the-record discussion between Mr. Anderson and Mr. Sugarman.] [¶] MR. ANDERSON: Q. Can you recall if he was armed? [¶] A. I would imagine he was armed. I don't—I didn't check to see if he was armed. [¶] Q. Okay. Can you remember if [*sic*] seeing his gun that evening? [¶] A. No."

*Officer Foley's testimony*: "Q. Did you remove your raid jacket? [¶] A. I do not think so, no, sir. [¶] Q. Did you see any other officer remove his raid jacket or in the apartment not wearing a raid jacket? [¶] A. Not that I can recall. [¶] Q. Did you see any officer in the apartment who [*sic*] raid jacket was loosened in the front, that is, not fully fastened? [¶] A. My own after a certain amount of time. [¶] Q. Other than your own which you say you loosened, did you see anyone else who had a loosened raid jacket? [¶] A. Not that I could say definitely that it was loosened, no, sir. [¶] Q. Were you paying particular attention to whether they were closed or loosened? [¶] A. No, sir. [¶] Q. So particular attention to Officer Irizarry, do you know whether his jacket, whether he removed or loosened his jacket during the execution of the warrant? [¶] A. No, sir. [¶] Q. So particular attention to Officer Irizarry, do you know whether his jacket, whether he removed or loosened his jacket during the the execution of the warrant? [¶] A. I know that he did not. [¶] Q. How do you know that? [¶] A. Because when he walked out the door originally I was going to go out the door. Officer Irizarry took my place and went outside with Sergeant Chinn and I can remember, you know, my last glance and I remember exactly how he was dressed on this warrant and he was so meticulous on the other warrants that I had been with him, he was almost kind of Marine-

based upon the evidence introduced at the second preliminary hearing the magistrate concluded that the facts were sufficient to find first degree murder with special circumstance and bound over Buckley to the superior court for trial for the offense and enhancements contained in the criminal complaint. In light of this record we cannot say that the trial court abused its wide discretion to exclude the testimony in dispute under Evidence Code section 352 or that the exclusion of the evidence prejudiced respondent's cause.

In light of our conclusion the additional issues raised by the parties need not be decided.

The order is reversed.

Channell, J., concurred.

**POCHÉ, Acting P. J.**—I respectfully dissent.

My colleagues and I agree that in a straight murder prosecution (i.e., one without a special circumstance allegation), the degree of the crime need not be charged and the magistrate need not make any finding with respect to the degree of the murder. (See majority opn., *ante,* pp. 520-521.) We also all recognize that where routine enhancements are charged—such as those that if found true add years to sentences—the magistrate must pass on the sufficiency of the evidence to hold the defendant to answer to the enhancement. (*People* v. *Superior Court (Mendella)* (1983) 33 Cal.3d 754, 761-762 [191 Cal.Rptr. 1, 661 P.2d 1081].) And we all acknowledge that this rule applies where the ultimate enhancement—a special circumstance— is involved. (*Ramos* v. *Superior Court* (1982) 32 Cal.3d 26, 33-34 [184 Cal.Rptr. 622, 648 P.2d 589]; accord *People* v. *Superior Court (Mendella),* *supra,* 33 Cal.3d at pp. 761-762.)

I part company with my colleagues at the point at which they conclude that when a special circumstance is charged the magistrate has no obligation to determine whether there is sufficient cause to believe the defendant is guilty of murder in the first degree. Because such a determination is a prerequisite to the validity of any special circumstance charge, I understand both *Mendella* and *Ramos* to compel the conclusion that the magistrate must determine whether there is sufficient cause to believe the defendant is guilty of murder in the first degree. To spell out the obvious: if sufficient cause

---

Corps drilled in dress standard type that we used to even tease him. Some times [*sic*] it was always buttoned up to the neck expecting him to have a tie on or something, on the top of it. [¶] Q. What you are saying is that when he left the apartment you are sure it was fastened all the way up? [¶] A. Yes, sir. [¶] Q. Do you know if prior to that he loosened his jacket? [¶] A. He never had in the past. I can not [*sic*] say no, he did not, but on all the warrants I have done prior to this, I mean, it was almost funny. [¶] Q. He would never loosen his jacket? [¶] A. Yes, sir."

of first degree murder is lacking the special circumstance charge fails because it attaches only to murders of the first degree.

Even if this court were free to ignore the ramifications of *Mendella* and *Ramos,* there is no reason to do so and every reason not to. The criminal procedure enunciated in the majority opinion subjects trial judges, jurors, defendants, the taxpayers and the entire criminal justice system to the enormously costly and time consuming procedure which attends any death penalty trial without first subjecting the matters that count to a judicial determination of reasonable cause. In doing so the majority's rule runs counter to the long standing recognition that a preliminary examination is a proceeding designed to weed out groundless or unsupported charges of grave offenses and to relieve the accused of the degradation and expense of a criminal trial. (*People* v. *Superior Court (Mendella), supra,* 33 Cal.3d at p. 759; *Jennings* v. *Superior Court* (1967) 66 Cal.2d 867, 880 [59 Cal.Rptr. 440, 428 P.2d 304]; *People* v. *Brice* (1982) 130 Cal.App.3d 201, 209 [181 Cal.Rptr. 518].)

What we end up with under this holding is a system of criminal procedure that affords a quick and efficient pretrial method for eliminating unnecessary trials in easy, run of the mill criminal prosecutions but abhors the use of such procedure in the most elaborate criminal proceedings yet devised: death penalty trials in the 1980's. To allow the procedure to take hold in the death penalty context, according to my colleagues, would be "novel and inventive" and lacking in "legal and logical support." (Cf., majority opn., *ante,* pp. 520-521.) So far as I can determine their description is accurate but misaimed.

For these reasons[1] I conclude that the superior court quite properly granted defendant's motion to set aside the information and therefore I would affirm the judgment.

A petition for a rehearing was denied August 14, 1986. Poché, Acting P. J., was of the opinion that the petition should be granted. Respondent's petition for review by the Supreme Court was denied October 2, 1986. Bird, C. J., and Reynoso, J., were of the opinion that the petition should be granted.

---

[1] Only because it is unnecessary to reach the alternative ground for judgment (i.e., that the magistrate also erred in refusing to allow the defense to call to the stand percipient police officer witnesses on the ground their testimony would involve an undue consumption of time (Evid. Code, § 352)) do I express no opinion with respect thereto except to comment that I agree entirely with the superior court and its terse analysis: that for the magistrate to take such a position in a death penalty case is "ludicrous."